## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| SUSAN ROWELL, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )    **CIVIL ACTION 07-0433-WS-M** |
| | ) |
| WINN DIXIE, | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 30) and Motion to Strike Plaintiff's Claim for Punitive Damages (doc. 33). The Motions have been briefed and are ripe for disposition.[1]

**I.    Background Facts.[2]**

This Title VII race discrimination and retaliation action arises from the employment relationship of plaintiff, Susan Rowell, a white female, and defendant, Winn-Dixie Montgomery, Inc., as well as the circumstances culminating in the dissolution of that relationship in July 2006.

**A.    *The Hotline Call of May 2006.***

Rowell commenced working for defendant as a cashier associate at a Winn-Dixie supermarket location in Monroeville, Alabama, on a part-time basis in December 2000, earning

---

[1]    The Court notes that defendant's Reply Brief (doc. 41) utilizes a much smaller font for its numerous footnotes than the 12-point type mandated by Local Rule 5.1(a)(2). In addition to inducing eye strain, this microscopic font size artificially shrinks defendant's Reply into the 15-page limitation provided by Local Rule 7.1(b) and the Rule 16(b) Scheduling Order (doc. 16, ¶ 13). This is improper. In its discretion, the Court will accept defendant's Reply as filed; however, counsel are cautioned to be more attentive to the Local Rules in the future.

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

$5.40 per hour.  (Rowell Dep., at 40-41 & Exh. 2.)[3]  Rowell later transferred to the dairy department and, ultimately, to the seafood department of that store.  (*Id.* at 46-47.)  As a part-time seafood associate, Rowell worked approximately 12-16 hours per week for Winn-Dixie. (*Id.* at 51.)  Although Rowell was based in the seafood department, she had occasion to work in the deli department to relieve deli employees going on break.  (*Id.* at 78-79.)  Rowell's interactions with African-American deli employees in the summer of 2006 lie at the heart of this litigation.

In early 2006, Rowell became interested in applying for a position as assistant front-end manager in the Monroeville store.  (*Id.* at 63.)  Winn-Dixie had a computer in the store that employees could access to examine and apply for posted internal job vacancies.  (*Id.* at 48-49.) Per Winn-Dixie policy, vacant jobs were to be posted for three days, after which the store manager would fill the vacancy by selecting the most qualified applicant.  (Leitner Decl., ¶ 13.) Rowell checked the computer daily on the days she was working, but never saw the assistant

---

[3]     The Court's review of the record has been complicated by two factors.  First, both parties have submitted lengthy affidavits from key witnesses that in some respects replicate, in others expound upon, and in others deviate from their deposition testimony.  Leitner's declaration is 13 pages and 51 paragraphs long, and Rowell's is 7 pages long.  As a result of these prolix declarations, it becomes a needlessly arduous task to piece together a complete picture of the testimony from the overlapping but sometimes diverging multiplicity of sworn statements from these critical witnesses.  Second, plaintiff filed two entire lengthy deposition transcripts, rather than simply the relevant excerpts, as required by Local Rule 5.5(c).  "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Thus, this Court will not scour uncited portions of the parties' evidentiary submissions for any scrap of evidence that may advance their positions.  *See Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it").  Instead, review of the parties' submissions is restricted to the portions of the record they have cited, and the legal arguments they have expressly articulated.

front-end manager position posted.  (Rowell Dep., at 65-66.)  Nonetheless, a black female named Michelle Burroughs was hired to fill that position in or around May 2006.  (*Id.* at 67-69.)[4]  Upset by this sequence of events, Rowell placed an anonymous call to a Winn-Dixie employee hotline on May 23, 2006 wherein she complained "that a position hadn't been posted into the thing – into the computer, and a friend of theirs was hired, and she was black."  (*Id.* at 72; Leitner Dep., at Exh. 3.)  The acting store manager at that time was a black female named Evangelina "Van" Penn, whose official title was co-manager.  (Rowell Dep. at 67; Leitner Dep., at 27-28.)[5]  Rowell disclaimed any personal knowledge of whether Penn was made aware of Rowell's complaint about the job posting issue.  (Rowell Dep., at 75-76.)  However, Rowell testified that she had specifically informed Penn "that the position hadn't been posted and I disagreed with the way they had handled stuff," without mentioning that she had called the hotline to complain.  (*Id.* at 76.)  Penn responded by stating that the assistant front-end manager job had been posted, a fact which Rowell disputes.  (Rowell Decl., ¶ 5.)

Rowell's anonymous hotline call was investigated by a white female named Rosemarie Leitner, who at that time was a human resources generalist field rep for Winn-Dixie.  (Leitner Dep., at 7, 22.)  In this capacity, Leitner provided HR functions for 21 stores in her district.  (*Id.* at 9-10.)  At that time, Leitner did not know the identity of the anonymous caller complaining about non-posting of jobs and racial favoritism at the Monroeville store.  (*Id.* at 25.)  In performing this investigation, Leitner spoke with Penn, examined job archives, and determined

---

[4]      Burroughs maintains that the position was, in fact, posted and that she became aware of it only by seeing that posting.  (Burroughs Decl., ¶ 4.)  For summary judgment purposes, however, the evidence must be taken in the light most favorable to the nonmovant; therefore, Rowell's testimony on this point will be credited and Burroughs' conflicting version will not.

[5]      According to Rowell, the previous store manager had left in April 2006 to take another store manager position, rendering Penn the acting store manager from April through July.  (Rowell Decl., ¶ 3.)  Penn remained in that position until a new store manager, Mike Henderson, arrived in July 2006, shortly before the incidents that precipitated Rowell's discharge.

that all positions had been posted before they were filled.  (Leitner Decl., ¶ 15.)[6]  Thus, Leitner found no violation of company policy that all job openings must be posted and that all applicants must apply via computer.  (Leitner Dep., at 26, 29-30.)  No corrective action was taken against Penn because no violation was found.  (*Id.* at 31; Penn Decl., ¶ 9.)  In speaking with Penn and front-end manager Jeanine Poindexter about this complaint, Leitner ascertained that "they had no idea who would have made the call" to complain about this issue.  (Leitner Dep., at 31.)  According to Leitner, "I investigated further about the anonymous call and no one said they had any idea who it might be."  (*Id.* at 81-82.)

Rowell objects that she "did not hear anything from anyone about this complaint" that she had phoned in via hotline until months later.  (Rowell Decl., ¶ 7.)  Given the anonymous nature of that complaint, it is unclear how Rowell believes Winn-Dixie officials should have known to follow up with her specifically, or why she faults them for not doing so.

### B.     The Harassment Investigation of July 2006.

On or about July 13, 2006, Leitner was contacted by Willie Thomas (who is black), an assistant manager at the Monroeville store, concerning a complaint of sexual harassment.  (Leitner Decl., ¶ 19; Leitner Dep., at 22, 35-36.)  Leitner visited the store to conduct an investigation on or about July 17, 2006.  (*Id.* at 38-40.)  At that time, Leitner collected written statements from multiple employees.[7]  The store's newly-assigned manager, Mike Henderson,

---

[6]     The Court recognizes Rowell's contention that during the time that Penn was acting store manager at least three positions were filled without being posted.  (Rowell Decl., ¶ 4.)  Assuming that to be true, however, plaintiff offers no evidence that these positions were identified in the archive research that Leitner performed, or that any other information available to Leitner during her investigation established a policy violation in this regard.

[7]     These statements list the dates of birth and social security numbers of many of the interviewed witnesses, most of whom are outsiders to this litigation.  Both defendant and plaintiff include copies of those statements in their summary judgment submissions, the difference being that defendant has redacted these highly sensitive personal identifiers while plaintiff has not.  (*See* doc. 37-4 at 6-15.)  In addition to displaying disregard for these witnesses' privacy, plaintiff's submission of these exhibits in unredacted form violates Standing Order No. 30 of this District Court and exposes these third parties to an unacceptable and unnecessary risk of identity theft.  This District Court's Administrative Procedure for Filing, Signing and Verifying Documents by Electronic Means places the burden for redactions squarely on litigants, as it states that "[i]t is the sole responsibility of counsel and the parties to ensure that redaction of

was present for all such interviews.  (Leitner Decl., ¶ 21.)  Leitner first spoke with Thomas

because he had brought the issue to her attention in the first place.  During that July 17

interview, Thomas indicated that he had received a complaint from Lisa Morrissette, the store's

deli department manager, concerning Rowell.  In particular, Thomas stated that on July 11, 2006

Morrissette reported to him that Rowell had asked Tawaka Bright, a black female deli associate

at the Monroeville store, to give her a kiss and had said, "You know I love you."  (Leitner Dep.,

at 42 & Exh. 4.)  The next day, Rowell repeated the behavior toward Bright, at which time

Bright told Rowell to get away from her.  (*Id.* at 43 & Exh. 4.)  To Leitner, Thomas's account

was a "red flag" for sexual harassment violations.  (*Id.* at 48.)

   After speaking with Thomas, Leitner met with Rowell that same morning to obtain her

side of the story.  (Leitner Dep., at 49.)  At that time, Leitner informed Rowell that a complaint

had been made concerning her behavior toward Bright.  (*Id.* at 51-52.)  What Leitner and Rowell

discussed next is a source of some dispute; however, Rowell acknowledges that, during that

meeting, she informed Leitner that she had kidded around with Bright, that she did not recall

what had been said between them, that she did not remember saying anything inappropriate, and

that she would be more careful in the future.  (Rowell Dep., at 86; Leitner Dep., at 49-50 & Exh.

5.)[8]  Rowell maintains that she denied having told Bright and Morrissette that she wanted to kiss

them.  (Rowell Decl., ¶ 8.)  Rowell further asserts that she told Leitner that Rowell had wanted to

---

personal identifiers is done."  (*Id.* at 13.)  This procedure is consistent with the E-Government
Act of 2002, Pub.L. No. 107-347, 116 Stat. 2899 (Dec. 17, 2002).  Nonetheless, the Court will
not sit idly by as privacy interests of third parties are trampled by the carelessness of defendant's
counsel in producing unredacted documents in discovery and of plaintiff's counsel in filing them
as-is.  To remedy this situation, the deposition exhibits of Rosemarie Leitner found at document
37-4 will be placed under seal, with access limited to parties and court personnel.

   [8]   Rowell now denies engaging in inappropriate sexual comments, touchings,
propositions or statements of affection toward Bright.  (Rowell Dep., at 80-81.)  However,
Rowell freely admits "kidding around" with Bright, indicating that "we would just kid around
about sexual stuff about going with your husband and doing all this – just sexual."  (*Id.* at 166-
68.)  Although not directly relevant to her claims against Winn-Dixie, Rowell denies having any
sexual interest in Bright.  And while her sexual orientation is not material to these proceedings,
Rowell testified, "I know I'm not a lesbian, I've known for twenty-eight years I'm not a lesbian.
And I would never approach a black or white woman for that."  (*Id.* at 155.)

apply for the assistant front-end manager job, to which Leitner responded that Penn "had got her hand slapped for that, that it wasn't properly posted." (Rowell Dep., at 88.)[9]  According to Rowell, Leitner also indicated that Rowell "had nothing to worry about" concerning her job, that "everything was okay," and that Leitner would recommend Rowell for an assistant manager position in the dairy department. (*Id.* at 88-89.)[10]

Leitner also conducted several other interviews on July 17 to investigate the Rowell sexual harassment allegations.  She met with Bright, who indicated that Rowell's mistreatment of her had been ongoing since May 2006, when Bright had begun working at that store. (Leitner Decl., ¶ 27; Leitner Dep., at Exh. 8.)  According to Bright, Rowell's unwelcome conduct had included touching her behind on two occasions and tickling her waist. (Leitner Dep., at Exh. 8.) Bright further indicated that Rowell would make statements like "I want me a black woman," ask Bright to "give her some sugar," and make kissing noises. (*Id.*)  On another occasion, Bright complained, Rowell asked Bright if Bright loved her.  When Bright said no, Rowell began wriggling her tongue "as if licking - like a man doing it to a woman." (*Id.*)  In a recent incident, Bright explained that she had been making sandwiches when Rowell came into her department

---

[9]      Leitner denies having ever told Rowell that Penn had been disciplined in connection with the job-posting issue. (Leitner Decl., ¶ 25.)  And both Leitner and Penn deny that Penn was ever disciplined or reprimanded in any way for failing to post a job vacancy.  For summary judgment purposes, however, the facts are taken in the light most favorable to Rowell, and her account is therefore accepted as true.

[10]      Following this interview, Rowell called Leitner on approximately four occasions to discuss the investigation. (Leitner Dep., at 74-76.)  In the first call, Rowell asked Leitner what the other witnesses were saying, to which Leitner demurred on the grounds that the investigation was ongoing. (*Id.*)  The second call, which occurred the next day, was much like the first, with Rowell pressing Leitner for details of the investigation and Leitner declining to share that information. (*Id.* at 75.)  In the third call, however, Rowell offered new allegations against Bright, specifically relating to Bright having pointed a knife at her and Bright having made a comment about her own sex life, which Leitner then investigated. (*Id.* at 75, 78-79 & Exh. 5.)  In the fourth and final call, Rowell identified herself as the anonymous caller who had complained about the alleged non-posting of jobs by Penn, and indicated she had additional information to support that accusation. (*Id.* at 76.)  As will be discussed, the timing of that fourth call is critical.

-6-

making kissing noises and asking for a kiss.  (Leitner Dep., at 78 & Exh. 8.)[11]  Bright indicated

that her response was to say that she was not going to put up with this, that she had been in jail

before for having to get someone off of her, and she would go again if need be.  (*Id.*)  Leitner did

not consider this statement to be a threat.  (*Id.* at 80.)  Bright stated that she had repeatedly told

Rowell to stop engaging in harassing conduct, but that Rowell had persisted.  (*Id.* at Exh. 8.)

Leitner also spoke with Morrissette (the deli manager), who stated that, just a few days

earlier, Rowell had asked Morrissette (who is black) to "give her some sugar," then came to the

deli department and asked Bright the same question.  (Leitner Dep., at 58 & Exh. 6.)  When

Bright became visibly upset, Morrissette asked Rowell to leave the deli department.  (*Id.*)

Morrissette told Leitner that, even after she had been asked to leave, Rowell kept walking by the

deli area, calling out Bright's name in an apparent attempt to antagonize her.  (*Id.*)  On another

occasion, Morrissette said, Rowell had grabbed Morrissette's arm and stated, "this is my

girlfriend," prompting Morrissette to tell her to stop.  (*Id.* at 59.)  Morrissette told Leitner that

she reported the matter to Thomas because she felt things were getting serious.  (*Id.* at 58-60,

67.)  Leitner also interviewed an employee named Pattie Riley, who indicated that just a few

days earlier Rowell had thrown her arms around Riley and said "she wanted a black woman."

(*Id.* at Exh. 7.)  When Riley rebuffed her, Rowell said "she was going to get her a black woman

and directed it toward" Bright, as well as a customer.  (*Id.*)

The record reflects that Leitner did not re-interview Rowell to confront her with the

additional allegations of wrongdoing that her investigation had unearthed, including Rowell's

alleged statements that she wanted a black woman, that she wanted some sugar, and that

Morrissette was her girlfriend, or her alleged actions of touching Bright's waist and buttocks,

_____

[11]        Bright's account of these incidents was corroborated, at least in part, by
handwritten notes that Bright furnished to Leitner during the investigation.  (Leitner Decl., ¶ 30
& Exhibit.)  For example, an entry dated July 11, 2006 reflects that Rowell kept coming over to
the deli counter and calling out Bright's name.  Another entry mentioned an incident in June
during which Rowell had purportedly hit her rear end twice, indicated she loved Bright, and
licked her tongue at her.  A third note recites the incident in which Rowell indicated that she
wanted a black woman.  A fourth note states that on July 10, 2006, Rowell came to the deli
department and acted as if she was trying to kiss Bright.  On all or nearly all of these occasions,
the notes reflect, Bright rebuffed Rowell's advances and told her to stop.

wagging her tongue in a sexually suggestive manner, throwing her arms around Riley, grabbing Morrissette's arm, and the like.  Had she been asked, Rowell would have categorically denied engaging in all of these behaviors.  (Rowell Decl., ¶ 10.)

Not all of the witnesses whom Leitner interviewed were adverse to Rowell.  A cashier named Mandy or Amanda, who identified herself as Rowell's best friend, advised Leitner that "people didn't know how to take [Rowell]'s jokes, but that she didn't believe [Rowell] had done anything that was inappropriate."  (Leitner Dep., at 86.)[12]  Another employee, Bridget Wiggins, submitted a "to whom it may concern" statement dated July 13, 2006, indicating that Rowell had not offended her and that everyone jokes sometimes.  Wiggins' statement was provided to Leitner during the investigation.  (Id. at 95-96 & Exh. 9.)  A third employee, Maranda Brown, informed Leitner during the investigation that she had "never heard anything sexual" from Rowell.  (Brown Aff., ¶ 3.)[13]

As noted supra, after giving her statement to Leitner, Rowell called her back and said that Bright had waved a knife at Rowell and told Rowell to get away from Bright on one occasion.  (Rowell Dep., at 165.)[14]  By Rowell's own account, this incident consisted of Rowell placing her arm around Bright while she was making sandwiches, following which Bright "just pointed the knife at [Rowell] and said you need to stop and that's all. [Rowell] just thought she was having a bad day."  (Id. at 168; Rowell Decl., ¶ 9.)  Aside from that one instance, Rowell denies that Bright ever told her to stop kidding around with her.  (Rowell Dep., at 168.)  If Bright

---

[12]     This was apparently Mandy Norwood, who avers that she informed Leitner that she was unaware of any sexual comments by Rowell.  (Plaintiff's Norwood Aff., ¶ 4.)

[13]     Brown (who is white) offers her opinion that Rowell was "retaliated against by the blacks because she turned them in for not posting the jobs."  (Brown Aff., ¶ 4.)  It is not clear who "the blacks" are, although they presumably include Penn and Poindexter.  Brown also indicates that Bright is Penn's cousin, in an apparent attempt to bolster the notion that the sexual harassment allegations against Rowell were a conspiracy fabricated by "the blacks" to get back at Rowell.  (Id., ¶ 3.)  There is no indication that Brown ever shared her "conspiracy" theory with Leitner during the investigation, or that she or anyone else informed Leitner that Penn and Bright were related.

[14]     Rowell's testimony on this point contradicted her own previous deposition testimony, wherein she denied having ever told Leitner or anyone else that Bright had pointed a knife at her and told Rowell to get away from her.  (Rowell Dep., at 85-87, 103.)

had "pointed the knife and threatened her, it would have been a violation" of Winn-Dixie policy. (Leitner Dep., at 63-64.)  When Leitner learned of this allegation against Bright, she followed up by interviewing several witnesses, including two people who may have been there at the time of the knife incident.[15]  Leitner's understanding from her inquiries of Thomas (whom she believed had witnessed this incident) was that the knife was pointed toward the floor, not at Rowell, and that the only reason Bright had a knife at all was because she was making sandwiches when Rowell touched her.  (Id. at 64-6 & Exh. 4.)[16]  For her part, Bright answered Leitner's follow-up questions by denying having threatened Rowell with a knife, and indicating that she had a knife in her hand because she was making sandwiches.  (Id. at 79, 100 & Exh. 8.)  Leitner found no wrongdoing by Bright and "did not find anything that substantiated" Rowell's allegations about the knife incident.  (Id. at 81, 83.)[17]

---

[15]     The uncontroverted record evidence is that Leitner learned of Rowell's allegations concerning the knife incident and performed this follow-up investigation only after she had already recommended Rowell's discharge for violation of the company's sexual harassment policy.  (Leitner Decl., ¶ 42.)  Even if the timing were otherwise, that discrepancy would not be material to the issues presented on summary judgment.

[16]     Plaintiff insists that Thomas did not witness the knife incident; however, nothing in Thomas's written statement or his declaration establishes that he did not.  As such, there is no record basis for impugning the reasonableness of Leitner's understanding that Thomas had witnessed that event.

[17]     In addition to the knife allegation, Rowell had reported to Leitner that Bright would talk about sex in the workplace.  According to Rowell, in her initial interview, she told Leitner that Bright had joked that (a) Bright's uterus "was too worn out because of too much sex"; and (b) Bright would have to stand on the street corner for sex because Winn-Dixie didn't pay enough.  (Rowell Decl., ¶ 8.)  By her own account, however, it was Rowell who had initiated the former topic by "kidding around for a couple of weeks" with Bright that she (Rowell) had an operation to cauterize her uterus, which elicited the response from Bright about her own uterus. (Id.)  Rowell did not tell Leitner that she was offended by Bright's comments; to the contrary, Rowell admitted that "everything was a joke and no one was offended by what me and [Bright] were saying about the operations."  (Rowell Decl., ¶ 9.)  Despite not being offended by Bright's comments, Rowell reported them because, in her words, "Only after knowing that my job was on the line did I feel it necessary to tell [Leitner] that [Bright] should be investigated too."  (Id., ¶ 9.)  When Leitner investigated, Bright denied talking about sex with Rowell, but did acknowledge that the two of them had talked about surgical procedures relating to the lining of the uterus.  (Leitner Dep., at Exh. 8.)  Bright admitted that she had told Rowell that Bright's "uterus was gone."  (Leitner Decl., ¶ 44.)

At some point during her investigation, Leitner became aware that Rowell "may have been involved in an EEOC case" against Winn-Dixie previously; however, Leitner "didn't know the details of it." (Leitner Dep., at 21-22.)  In her declaration, Leitner averred that she was unaware of Rowell's earlier EEOC charge at the time she made her findings in the sexual harassment investigation. (Leitner Decl., ¶ 48.)  Moreover, plaintiff does not appear to be asserting any retaliation claims in this action predicated on that prior EEOC charge as the requisite protected activity.

### C.    The Termination of Rowell's Employment.

Upon completing her investigation, Leitner concluded that Rowell had been involved in an ongoing series of inappropriate behaviors. (Leitner Dep., at 89.)  Leitner "felt that the statements taken supported the allegation" that Rowell had violated the sexual harassment policy, and recommended termination because Rowell "had been told to stop by [Bright] and [Morrissette] on more than one occasion.  And it not only continued; it escalated." (*Id.* at 101.)[18] Leitner submitted this recommendation to her supervisor, Fred Conner, who approved it and made the final decision to terminate Rowell's employment for violation of the company's sexual harassment policy, effective July 29, 2006. (*Id.* at 101-02; Leitner Decl., ¶ 39.)  For his part, Conner had no knowledge of Rowell's prior EEOC charge or hotline call when he approved Leitner's discharge recommendation. (Conner Decl., ¶¶ 8-9.)  No store managers or employees (including Penn, Thomas, Bright, Riley or Morrissette) assisted Leitner in making, approving or discussing that recommendation. (Leitner Dep., at 102.)

Leitner's testimony is unequivocal that only after she submitted the recommendation to terminate Rowell's employment did she learn that Rowell was the anonymous caller who had utilized the Winn-Dixie hotline in May 2006 to complain about Penn's purported failure to post job openings. (Leitner Decl., ¶¶ 18, 49.)  At no time during her July 17 interview did Rowell

---

[18]      Leitner articulated the rationale for her recommendation in the following terms: "Based on my investigation, which included statements from four employees confirming that Rowell had engaged in sexually suggestive behavior and a statement from Rowell (who did not directly deny the allegations), and my understanding of Winn-Dixie's sexual harassment policy, I determined that Rowell had engaged in inappropriate behavior in violation of Winn-Dixie's sexual harassment policy.  I further took into account that both associate Bright and deli manager Morrissette had asked Rowell to stop but [she] refused." (Leitner Decl., ¶ 35.)

inform Leitner that she had made the anonymous hotline complaint in May.  (*Id.*, ¶ 25.)  Rowell never suggested to Leitner that Penn, Poindexter, Bright and others had orchestrated these sexual harassment charges as a conspiracy to retaliate against Rowell for being white or for having made the anonymous phone call.  (*Id.*, ¶ 37.)  Leitner did not perceive any basis from the facts gathered in her investigation to conclude that the allegations against Rowell were fabricated.  (*Id.*, ¶ 36.)  She had no reason to believe that the complaining witnesses were lying.

Also after Leitner made her recommendation, she was contacted by an employee named Mandy Norwood who asked to give a statement in support of Rowell.  Norwood informed Leitner that she had overheard Bright say that her doctor had told her that she was "worn out from intercourse."  (Leitner Decl., ¶ 45.)[19]  This was not new information.  Brown had told Leitner the same thing.  (Brown Aff., ¶ 3.)  So had Rowell.  This "too much sex" / "worn out" comment had already been fully investigated by Leitner.  In any event, Norwood did not indicate that she or anyone else had been offended by Bright's comment.  (*Id.*)  To the contrary, Norwood's recollection was that Rowell, Bright and others had laughed about it.  (Defendant's Norwood Decl., ¶ 4.)  As such, Norwood's information added nothing of substance to Leitner's investigation.[20]

After Rowell gave her statement to Leitner on or about July 17, 2006, Penn instructed her not to return to work until the investigation was completed.  (Rowell Dep., at 93-94.)  The

---

[19]    Both sides have submitted dueling affidavits from Norwood concerning what she told Leitner and when.  Plaintiff's Norwood affidavit fixes the date on which she gave this statement as September 17, 2006, while Leitner was physically present at the store conducting the investigation.  (Plaintiff's Norwood Aff., ¶ 4.)  Leitner's testimony is that she didn't speak to Norwood until sometime later, after she had submitted the termination recommendation.  The timing of Norwood's contact with Leitner is not material to the issues presented on summary judgment.  Simply put, it is of no consequence whether Norwood met with Leitner on September 17 or thereafter.  Whichever date it was, there is no dispute as to the substance of the information Norwood related to Leitner concerning Bright.

[20]    Following her discharge, Rowell had a conversation with Norwood, who informed her at that time that she had given a statement that Bright "had been sexually inappropriate too."  (Rowell Dep., at 96.)  The "worn out" comment was apparently the sole basis of Norwood's contention that Bright had been inappropriate in the workplace.  There is no indication that Norwood or anyone else complained about or objected to this comment when Bright made it.

decision to suspend Rowell pending the outcome of the investigation was made by Leitner based on the nature of the allegations.  (Leitner Decl., ¶ 26.)  Approximately two weeks later, Rowell returned to the store.  At that time, Henderson (who was not a decisionmaker) informed Rowell that her employment had been terminated and that "he thought things had been carried too far, but he had to terminate [her]."  (Rowell Dep., at 90-91; Leitner Dep., at 38.)

While Rowell was on suspension, an employee named "Miranda" told her that she had heard Penn and Poindexter talking in the office about how Rowell had made the telephone call complaining about the assistant front end manager position not having been posted.  (Rowell Dep., at 96-97.)  This was apparently Maranda Brown, from whom plaintiff obtained an affidavit during the summary judgment process.  Brown's affidavit indicates that she overheard Penn and Poindexter "discussing the fact that they knew that [Rowell] had reported them, that they were angry at her having done so, and that they had gotten in trouble for not posting the jobs." (Brown Aff., ¶ 1.)  There is no indication, however, that Brown or Rowell ever told Leitner what Brown had overheard.  As such, that information was not part of Leitner's investigation and could not have factored into Winn-Dixie's decision to discharge Rowell.

> ### D.     The Lawsuit.

On June 15, 2007, after receiving a right-to-sue letter from the EEOC, plaintiff filed her Complaint (doc. 1) against Winn-Dixie in this action.[21]  The Complaint identifies claims of race and sex discrimination, as well as retaliation, and invokes Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* and 42 U.S.C. § 1981 as statutory grounds for

---

[21]     This action constitutes Rowell's second lawsuit against Winn-Dixie in this District Court.  In September 2004, Rowell filed an action styled *Susan Rowell v. Winn-Dixie*, Civil Action No. 04-0601-WS-M, alleging claims of race and sex discrimination pursuant to Title VII and 42 U.S.C. § 1981.  The 2004 lawsuit was predicated on Rowell's claim that she had been denied a position in the seafood department of the Monroeville store with more hours in October 2003 when Sherry Davis, Department Manager, said that a male would do better in the job.  According to Rowell's 2004 complaint, the position was filled by a black male and she did not receive any additional work hours.  After a lengthy stay during Winn-Dixie's Chapter 11 bankruptcy proceedings, the parties stipulated to dismissal of that 2004 action in early 2006.

relief.[22]  As briefed by plaintiff on summary judgment, her claims consist solely of arguments that she was discharged because of her race and in retaliation for having complained about race-based filling of job vacancies at the Monroeville store.

According to Rowell, she believes that her termination was based on her race because "there was a black person that put these allegations against [her] ... [a]nd everyone that is involved is black."  (Rowell Dep., at 105-06.)  Plaintiff's theory, then, is that Bright and other black employees at the Monroeville store conspired to concoct these allegations of sexually inappropriate behavior to get Rowell fired.  (*Id.* at 108-09.)  No one from Winn-Dixie ever told Rowell that her dismissal was because she is white, or directed any racial slurs against her, or made any racially derogatory statements to her.  (*Id.* at 109-10.)

As for her retaliation claim, Rowell contends that her discharge was retaliatory "[b]ecause of the phone call that [Rowell] had made and Vann got her hand slapped for not posting the position correctly."  (Rowell Dep., at 123, 134-35.)[23]

Winn-Dixie has now moved for summary judgment as to both theories, contending that there are no genuine issues of material fact and that it is entitled to entry of judgment in its favor as a matter of law on both the race discrimination and retaliation causes of action.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference

---

[22]      The sex discrimination theory has been abandoned.  Plaintiff's summary judgment filings make no reference to allegations of gender-based discrimination, and Rowell acknowledged in her deposition that she was not suing Winn-Dixie for sex discrimination and did not believe the complained-of actions were based on her gender.  (Rowell Dep., at 151-52.)

[23]      In her deposition, Rowell also suggested that her discharge was retaliatory because of the 2004 lawsuit.  (*Id.* at 121-26.)  Rowell testified, "It started in 2004, it seems like after I filed the lawsuit it was just always trumped up, everything was trumped up.  Everything was scrutinized."  (Rowell Dep., at 130.)  But Rowell acknowledged that none of the Winn-Dixie managers involved in the allegations from the 2004 lawsuit, to her knowledge, had any input into the decision to terminate her employment in 2006.  (*Id.* at 131-33.)  And plaintiff's summary judgment filings make no pretense of relying on the 2004 lawsuit (or its precursor EEOC charge) as a protected activity undergirding her retaliation claim.

-13-

to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

**III.    Analysis.**

        **A.    *Discriminatory Discharge Cause of Action.***

                *1.    The* McDonnell Douglas *Framework.*

The parties' summary judgment arguments on Rowell's discrimination claims will be assessed in accordance with the time-honored *McDonnell Douglas* framework. Absent direct evidence of discrimination (which has neither been alleged nor shown here), Rowell must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race

discrimination.[24]  If she does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).

At that point, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).  Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient."  *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [the adverse employment action] was pretextual.").  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).  Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).

2.     *Sufficiency of Plaintiff's* Prima Facie *Case.*

Rowell contends that her discharge by Winn-Dixie constituted unlawful race discrimination, in violation of Title VII and § 1981.  "To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to

---

[24]     Rowell's burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see also Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (similar).  Importantly, "[a] plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class." *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005).  "Only after the plaintiff has made his *prima facie* case does the burden shift to the defendant." *Id.*

The first, second and third elements of this *prima facie* test are plainly satisfied.  Indeed, the summary judgment evidence unambiguously demonstrates that Rowell does belong to a protected class (she is white), that she was qualified to work as a seafood associate at the Winn-Dixie store in Monroeville (she had worked in that capacity in that store for several years), and that she was subjected to adverse employment action (she was fired in July 2006).  Rowell's ability to establish a *prima facie* case of race discrimination therefore turns on whether she has identified a comparator who was treated better than she was and who was not a member of her protected class.  "A comparator is an employee similarly situated to the plaintiff in all relevant respects." *Rioux*, 520 F.3d at 1280 (citations, brackets and internal quotes omitted).  Winn-Dixie maintains that she has failed to satisfy her burden in this regard.

Rowell testified that she was unaware of any African-American employees who had violated Winn-Dixie's sexual harassment policies.  (Rowell Dep., at 110-11.)  However, she later revised her answer to classify Bright as a black employee who had engaged in sexual harassment in the workplace.  (*Id.* at 112.)  Rowell identified the following conduct by Bright that she contended violated Winn-Dixie's sexual harassment policies: (a) a statement by Bright that she (Bright) could not have surgery to end her menstruation cycle "because she had had too many men"; (b) Bright's statement that Bright had "to go stand on the corner because Winn-Dixie doesn't pay enough"; and (c) "comments about different sexual stuff" that would prompt her co-workers to laugh.  (Rowell Dep., at 114.)  As an example of those sexual jokes, Rowell indicated that Bright would say that the Winn-Dixie food "looked like sexual stuff, you know semen or

cum or stuff." (*Id.* at 114-15.)  Rowell denied having reported Bright's conduct to Winn-Dixie management.  (*Id.* at 115.)  To her knowledge, no one else had ever complained about Bright's conduct either, although a co-worker (Norwood) did mention it during Winn-Dixie's investigation of Rowell.  (*Id.* at 119.)

Examining the summary judgment record in the light most favorable to plaintiff, Winn-Dixie performed an investigation in July 2006 in which multiple employees (including both managers and rank-and-file associates) identified a pattern of sexually harassing conduct by Rowell directed at female co-workers.  Such conduct included both inappropriate comments (*i.e.*, stating that she "wanted" a black woman, asking co-workers if they loved her, asking for "some sugar" from co-workers, asking co-workers for kisses, identifying another employee as her "girlfriend") and actions (*i.e.*, making kissing noises, touching a co-worker's buttocks, wagging her tongue in a sexual manner, taunting a co-worker who spurned her advances).[25]  By Rowell's own admission, at least one victim of this conduct (Bright) became upset and told her to stop.  The evidence in the light most favorable to Rowell is that a managerial employee (Morrissette) brought Rowell's conduct to store management's attention after surmising that it appeared "serious."

By contrast, the only misconduct of Bright that was reported to Winn-Dixie was as follows: (a) a statement (in a conversation initiated by Rowell about her own reproductive organs) that Bright was worn out from having too much sex; (b) a statement that Bright would have to stand on the street corner for sex because Winn-Dixie did not pay enough; and (c) the incident in which Bright responded to Rowell's "kidding around" by telling her to stop, waving a knife, and indicating that she'd been to jail before for getting someone off of her and she'd go again.  No employee at Winn-Dixie ever complained of or professed to be offended by Bright's comments about too much sex or standing on the street corner.  As for the knife incident,

---

[25]     To be clear, the Court is not making findings of fact that these events actually happened.  Rowell denies having engaged in this conduct, and the Court must credit her version of the facts at the Rule 56 stage.  The point is not that Rowell actually engaged in such misconduct, but that multiple employees reported to Winn-Dixie that she had, and that Winn-Dixie discharged her for having engaged in such misconduct.  Therefore, that is the conduct against which any comparator's misdeeds must be measured, notwithstanding Rowell's denial that those events ever took place.

Rowell's own testimony makes clear that she reported it during the sexual harassment investigation in an attempt to save her own job by throwing her accuser under the proverbial bus. (Rowell Decl., ¶ 9.)  There is no indication that Rowell herself felt scared or threatened by the knife incident (which she herself had instigated by putting her arm around Bright as the latter was making sandwiches); furthermore, after investigating the incident Winn-Dixie concluded that Bright had not threatened Rowell, with a knife or otherwise.

Side-by-side comparison of the alleged misconduct of Rowell and Bright reveals that plaintiff's reliance on Bright as a comparator is misplaced and unavailing, as a matter of law. Under the law of this Circuit, a Title VII plaintiff "has the burden to establish that a similarly situated person outside of her protected class was treated differently." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1217 (11th Cir. 2008).  Moreover, "to determine whether employees are similarly situated, ... we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1322-23 (11th Cir. 2006).[26]  "Misconduct merely similar to the misconduct of the disciplined plaintiff is insufficient."  *Rioux*, 520 F.3d at 1280 (citation omitted).  Rather, "[i]n order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the non-minority employee."  *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).

Obviously, Bright is not similarly situated to Rowell in all relevant aspects.  Rowell was accused of touching, propositioning, and making advances to female co-workers, even after being told to stop.  Bright was accused of making occasional ribald or off-color comments in the

---

[26]        *See also McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008); *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (plaintiff must show "that the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained") (citations omitted).  Plaintiff urges this Court to adopt the less stringent "similar misconduct" standard recited in *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1334 (11th Cir. 2000).  However, the Eleventh Circuit has recently confirmed that it is the *Burke-Fowler* "nearly identical" standard, and not the lesser *Alexander* "similar" standard, that governs.  *McCann*, 526 F.3d at 1374 n.4 (despite plaintiff's reliance on *Alexander*, "we are bound by precedent to adhere to the nearly identical standard").

-18-

workplace that offended none of her co-workers and that were not directed at them in an amorous or sexual way.  Bright was not accused of touchings, propositions, demands for kisses, or statements evincing a desire to have sexual relations with her co-workers.[27]  Simply put, the two sets of allegations are apples and oranges, with Bright's alleged misdeeds paling in comparison to Rowell's.

As for the knife incident, it did not involve sexually harassing conduct by Bright at all, but rather was her reaction to a perceived inappropriate physical touching by Rowell.  As such, it is dissimilar on its face from the conduct for which Rowell was discharged.[28]  Nor was any evidence ever presented to Winn-Dixie that Rowell or anyone else perceived Bright's conduct to threaten Rowell's well-being.  Both Bright and Thomas denied that the knife (which Bright was using to make sandwiches) was ever pointed at Rowell.  In fact, Rowell herself never testified that she felt threatened; to the contrary, she conceded that she reported the matter to Leitner after the fact only as a last-ditch effort to save her job by deflecting attention to Bright.  Thus, Rowell's argument overlooks the fact that Winn-Dixie found that Rowell did engage in sexual harassment but that Bright did <u>not</u> make a threat.  Bright is not similarly situated to Rowell for the simple reason that Winn-Dixie never found that Bright had violated any company policy, whereas it did find that Rowell had engaged in serious misconduct that violated company policy. Not only were the allegations of misconduct substantially dissimilar, but so were the results of the company's investigations.  Under no reasonable analysis can Bright's conduct be deemed "nearly identical" to Rowell's; therefore, she is not a viable comparator for Title VII purposes.

---

[27]     In that regard, Leitner's testimony is uncontroverted that at no time in her investigation did anyone report that Bright had engaged in inappropriate touchings, attempted to kiss her co-workers, stated that she "wanted" them, wiggled her tongue in a sexual manner, or otherwise engaged in conduct akin to that alleged with respect to Rowell.  (Leitner Decl., ¶ 47.)

[28]     Plaintiff's theory that both sexual harassment and threats are terminable offenses under Winn-Dixie policy is inadequate to render Bright a valid comparator.  The Eleventh Circuit has declared that "it is insufficient to characterize conduct as similar for Title VII analysis simply because it may result in the same or similar punishment."  *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1312, *modified*, 151 F.3d 1321 (11th Cir. 1998).  Thus, more similarities are required than a mere showing that both plaintiff and comparator were accused of misconduct punishable by discharge.

Inasmuch as plaintiff has failed to meet her burden of showing that a similarly situated employee outside her protected class was treated more favorably than she, the Court concludes that Rowell has failed to make out a *prima facie* case of race discrimination; therefore, her claims for racially discriminatory discharge under Title VII and § 1981 fail as a matter of law.[29]

### B.    Retaliatory Discharge Cause of Action.

Defendant also moves for summary judgment on plaintiff's claim that her discharge

------

[29]    Even if plaintiff had satisfied the "similarly situated" element of her *prima facie* case, this Court would still grant summary judgment to defendant on the race discrimination claims. Winn-Dixie plainly offered a legitimate non-discriminatory reason for firing Rowell, namely, its determination that she had violated the company's sexual harassment policy. Rowell has failed to show that this stated reason was a pretext for race discrimination. The Court understands that plaintiff takes issue with the sufficiency of defendant's investigation, and contends that Leitner did a poor job in that regard. But if an employer holds an honest, good-faith belief in the reason for an employee's dismissal, such a reason is not proven pretextual even if that belief is incorrect or mistaken. *See E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000) (affirming summary judgment for defendant where employee was fired for lying in investigation, and plaintiff offered no evidence that defendant lacked a good-faith belief that employee had lied); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *Wilson*, 376 F.3d at 1092 (where employee was discharged for insubordination, her self-serving assertion that she was not insubordinate does not establish that she was terminated because of gender, and whether employee's conduct was insubordinate is not an issue for federal courts to referee); *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one."). Thus, for example, it may have been prudent or a sound HR practice for Leitner to confront Rowell with all of the allegations against her (rather than just some of them) and hear her side of the story before taking adverse action against her. Leitner's failure to do so may have been precipitous, arbitrary, or downright unfair. But Title VII does not charge this Court with evaluating the equities or the soundness of a defendant's personnel practices. "We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Wascura v. City of South Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (citation omitted). Plaintiff has failed to make a showing from which a reasonable fact finder could conclude that Winn-Dixie's decision to fire her for sexually harassing her co-workers, based on an investigation in which at least four managerial and hourly employees at the Monroeville store attested to her inappropriate behavior, was a pretext and that the real reason she was fired was because she is white.

-20-

constituted unlawful retaliation.  Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("Retaliation is a separate violation of Title VII.").[30]  In the absence of direct evidence, Title VII retaliation claims turn on the same *McDonnell Douglas* burden-shifting analysis applicable to other Title VII claims, as discussed in § III.A.1., *supra*.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (explaining that retaliation plaintiff must establish elements of claim, after which employer has opportunity to articulate legitimate nonretaliatory reason for challenged action, with plaintiff bearing ultimate burden of proving retaliation by preponderance of evidence and that employer's stated reason is a pretext for prohibited retaliatory conduct).  As with the race discrimination claim, Rowell's ability to make a *prima facie* showing of retaliation lies at the heart of the parties' Rule 56 filings.

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  *Crawford*, 529 F.3d at 970; *see also Butler*, 536 F.3d at 1212-13 ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citing *Goldsmith*, 513 F.3d at 1277); *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008).  Winn-Dixie cannot and does not assert that Rowell failed to engage in protected activity, given the evidence that she had called the employee hotline to complain about alleged race-based hiring practices at the Monroeville store just two months before her discharge in July 2006.  Nor can defendant challenge the "adverse employment action" prong, in light of the fact that Rowell was fired.  However, defendant does

---

[30]     *See also Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed").

seek summary judgment on the ground that plaintiff has failed to establish the "causal connection" element of her *prima facie* case of retaliation.

"We construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Goldsmith*, 513 F.3d at 1278 (citation omitted). "In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.* (citations omitted). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him. As with most facts, the defendant's awareness can be established by circumstantial evidence." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Thus, the Eleventh Circuit has repeatedly held that retaliation claims under Title VII or § 1981 must be dismissed where the plaintiff fails to present sufficient evidence to establish that the defendant's decision maker was aware of her protected conduct. *See, e.g., Brungart*, 231 F.3d at 799; *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1355-56 (11th Cir. 1999); *Hudson v. Southern Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988); *McCollum v. Bolger*, 794 F.2d 602, 610-11 (11th Cir. 1986); *Collins v. Board of Trustees of University of Alabama*, 2006 WL 3522043, *1 (11th Cir. Dec. 6, 2006) (affirming dismissal of retaliation claims where "there is no evidence in the record that the supervisor responsible for Collins' workload was aware of his protected activity before increasing the workload").

Taking the evidence in the light most favorable to plaintiff, there were two and only two Winn-Dixie decisionmakers involved in the decision to terminate her employment in July 2006. Leitner made a recommendation that Rowell be discharged for violating the company's sexual harassment policy. (Leitner Dep., at 101; Leitner Decl., ¶ 35.) Conner approved that recommendation and terminated Rowell's employment effective July 29, 2006. (Rowell Decl., ¶ 39; Conner Decl., ¶ 4.) Leitner unequivocally denies any knowledge that Rowell was the person who had made the anonymous May 2006 hotline complaint until <u>after</u> Leitner made her termination recommendation. (Leitner Decl., ¶¶ 18, 49.) Conner likewise professes ignorance that Rowell was the one who had placed the hotline call at the time he approved Leitner's recommendation. (Conner Decl., ¶ 8.)

Against defendant's evidence that its decisionmakers were unaware prior to making that

-22-

decision that Rowell had called the hotline, plaintiff contends that "the facts show that Leitner, Penn, and Jeanine all knew that Rowell was the one who called the hot line." (Plaintiff's Brief (doc. 38), at 23.) What Van Penn and Jeanine Poindexter knew is irrelevant unless either (a) they were decisionmakers in Rowell's termination decision, or (b) they shared such knowledge with Leitner prior to her recommendation. *See Bass v. Board of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, ***the plaintiff must show that the person taking the adverse action was aware of the protected expression***.") (emphasis added). The record conclusively refutes both prongs. (Leitner Decl., ¶¶ 41, 49.) There is no evidence that Penn or Poindexter participated in the firing decision or that they told Leitner prior to that decision that Rowell had engaged in protected activity. Thus, it does not matter what Penn and Poindexter knew.

As for Leitner, plaintiff acknowledges Leitner's testimony that she did not learn of Rowell's involvement in the hotline complaint until after Leitner made her recommendation. Neither Rowell's deposition nor her lengthy declaration include statements that she informed Leitner of her hotline call at the initial July 17 interview or at any other time before Leitner submitted her recommendation. Even though plaintiff has no evidence to contradict Leitner's testimony on this point, plaintiff asks the Court to ignore Leitner's testimony because "Roswell [*sic*] told her she had not been able to bid on the assistant manager position and Leitner told her Penn had her hand slapped for not posting the position and then recommended her for another position." (Plaintiff's Brief (doc. 38), at 23.) Although plaintiff fails to elaborate, her reasoning is apparently as follows: (1) Leitner had investigated the May 2006 anonymous hotline call concerning Penn's alleged failure to post vacant positions; (2) during the July 2006 sexual harassment investigation Leitner interviewed Rowell; (3) in that interview Rowell said she had not been able to apply for an assistant manager job; and (4) Leitner must have surmised from that statement that Rowell was the person who had called the hotline in May 2006. This strained logic is not rooted in any reasonable inference from the record, but instead trades on speculation and innuendo. As such, it is wholly inadequate to satisfy Rowell's burden of showing that Leitner was aware of Rowell's protected activity before she recommended Rowell's discharge for violation of the company's sexual harassment policy. *See, e.g., CBS Broadcasting, Inc. v.*

-23-

*EchoStar Communications Corp.*, 450 F.3d 505, 518 n.25 (11ᵗʰ Cir. 2006) (for summary judgment purposes, "an inference based on speculation and conjecture is not reasonable") (citation omitted); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11ᵗʰ Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation omitted).[31]

In sum, the summary judgment record is devoid of evidence from which a reasonable factfinder could conclude that the Winn-Dixie decisionmakers who recommended and decided Rowell's discharge were aware that she had engaged in protected activity by making an anonymous call to an employee hotline two months earlier. As such, plaintiff has not established the requisite elements of a *prima facie* case of retaliation, and her Title VII and § 1981 retaliation claims fail, as a matter of law.[32]

---

[31] Equally unhelpful to plaintiff's cause is the unsupported statement in plaintiff's opposition brief that "Leitner interviewed Rowell and was told by her she is the person who made the anonymous call about race discrimination." (Doc. 38, at 29.) In the absence of any evidence to support this assertion that Rowell informed Leitner of her placement of the anonymous call during their July 17 interview, the Court cannot simply take counsel's word for it. Indeed*,* "[u]nadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence." *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008); *see also Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1ˢᵗ Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment.").

[32] Even if Rowell had established a *prima facie* case of retaliation, Winn-Dixie has come forward with a legitimate nonretaliatory reason for its termination decision by showing that she was fired for violating the company's sexual harassment policy. Rowell has failed to show pretext. At most, she criticizes the sufficiency and depth of the investigation, and suggests that Leitner did a lackluster job interviewing witnesses and documenting their responses. In essence, then, plaintiff would have this Court second-guess Winn-Dixie's investigation. But this Court is not tasked with grading Winn-Dixie's human resources practices or performing a *de novo* sexual harassment investigation. *See, e.g., Chapman*, 229 F.3d at 1030 ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions."). Nothing in plaintiff's argument or evidence creates genuine issues of fact as to whether Winn-Dixie honestly believed her to have violated the sexual harassment policy at the time of her dismissal. As such, plaintiff's showing of pretext is inadequate, and summary judgment would be warranted in defendant's favor even if plaintiff had successfully made out a *prima facie* case of retaliation.

IV.     **Conclusion.**

Although the parties have clouded the record with hundreds of pages of overlapping exhibits, the underlying facts of this case are simple.  Winn-Dixie received a complaint that Rowell had been sexually harassing co-workers at the Monroeville store.  An investigation turned up a litany of allegations, confirmed by multiple witnesses, of inappropriate romantic overtures, gestures and comments that Rowell had directed toward female co-workers, even after being told repeatedly that such conduct was unwelcome.  The company credited those allegations and terminated Rowell's employment for violating its policy against sexual harassment.  In this lawsuit, Rowell expresses disagreement with the results of the company's investigation.  She criticizes the investigator for having a faulty memory, for failing to ask follow-up questions, for failing to write down everything she was told, and for not crediting the statements of witnesses favorable to her.  She denies engaging in wrongdoing, although she admits "kidding around" with her co-workers, and tries to deflect blame to the alleged victim.  If the evidence is taken in the light most favorable to Rowell, Winn-Dixie might be guilty of suboptimal HR practices, but that does not equate to race discrimination or retaliation.  The alleged victim may well have told off-color jokes of a sexual nature, but Winn-Dixie's investigation reasonably determined that Rowell's behavior was far more egregious.  On this showing, the Court cannot say, and a reasonable factfinder could not find, that Winn-Dixie's decision to terminate Rowell's employment was made because Rowell is white or because Rowell had phoned in an anonymous complaint two months earlier.  Accordingly, defendant's Motion for Summary Judgment (doc. 30) is **granted** and this action is **dismissed with prejudice**.  A separate judgment will enter.

In light of this determination, defendant's Motion to Strike Plaintiff's Claim for Punitive Damages (doc. 33) is **moot**.

Finally, to safeguard the privacy interests of third parties whose personal identifiers have been compromised by plaintiff's unredacted summary judgment submission, the Clerk of Court

is **directed** to **seal** the deposition exhibits of Rosemarie Leitner found at document 37-4, with access to be limited to parties and court personnel.

DONE and ORDERED this 23rd day of September, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE